United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Ann Johnson, as the representative of a class of those similarly situated, and on behalf of Royal Caribbean Cruises Ltd. Retirement Savings Plan, Plaintiff,<br><br>v.<br><br>Russell Investments Trust Company, fka Russell Trust Company and others, Defendants. | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 22-21735-Civ-Scola |

### Order Granting Motions for Summary Judgment

Plaintiff Ann Johnson, as the representative of a class of those similarly situated, and on behalf of Royal Caribbean Cruises Ltd Retirement Savings Plan (the "Plan") (together "Johnson"), complains that Royal Caribbean Cruises Ltd. and the Royal Caribbean Cruises Ltd. Investment Committee (together "Royal Caribbean") and Russell Investments Trust Company (formerly known as Russell Trust Company) ("Russell") cost Plan participants millions of dollars in lost earnings as a result of a series of bad investment decisions. Johnson's complaint encompasses two counts, one against Russell and one against Royal Caribbean, for breach of their respective fiduciary duties under the Employee Retirement Income Security Act. (Am. Compl., ECF No. 31.) Previously, the Defendants answered the complaint (Russell's Ans., ECF No. 109; RC's Ans., ECF No. 110) and, upon the parties' agreement, the Court certified a class of all participants and beneficiaries of the Plan from October 1, 2015, until the date Russell was terminated (Cert. Order, ECF No. 161). Both Russell and Royal Caribbean now seek, separately, summary judgment, as to all claims against them, arguing there are no genuine issues of material fact that would warrant a trial in this case. (Royal Caribbean's ("RC") Mot., ECF No. 176; Russell's Mot., ECF No. 179.) Johnson has responded to both motions (Pl.'s Resp. to RC, ECF No. 191-1; Pl.'s Resp. to Russell, ECF No. 191-3), to which the Defendants have both timely replied (RC's Reply, ECF No. 198; Russell's Reply, ECF No. 196). The parties have also submitted their statements of facts and responses and replies thereto. (RC's Stmt., ECF No. 177; Russell's Stmt., ECF No. 180; Pl.'s Resp. Stmt. to RC, ECF No. 191-4; Pl.'s Resp. Stmt. to Russell, ECF No. 191-2; RC's Reply Stmt., ECF No. 197; Russell's Reply Stmt., ECF No. 199.) The

motions are now ripe for review. For the reasons that follow, the Court **grants** both motions (**ECF Nos. 176, 179**.)

## 1. Background[1]

At issue in this case is whether the Defendants breached their fiduciary duties as to the management of the Plan. For the most part, the parties do not dispute the core facts of this case. Instead, their disagreements stem primarily from their divergent characterizations of and inferences from those facts. Indeed, far too much of their material-fact-statement briefings are improperly laden with their respective interpretations of those facts. What follows, then, is the Court's best attempt to recite just the relevant facts, leaving the parties' respective interpretations of those facts, with a few minor exceptions, to the Court's legal analysis.

The Plan, a 401(k) plan, is the result of a December 31, 2015, merger of two previously separate plans: the Royal Caribbean Ltd. 401(k) Plan (the "401(k) Plan") and the Royal Caribbean Ltd. et al Retirement Plan, a trustee-directed profit-sharing plan (the "PSP" or the "Pension Plan"). (RC's Stmt. ¶ 1; Pl.'s Resp. Stmt. to RC ¶ 46.) The Plan is a defined contribution retirement plan, intended to encourage and assist in providing a regular savings program for eligible employees. (RC's Stmt. ¶ 2.) Two committees oversee the Plan: the Administrative Committee and the Investment Committee (sometimes the "Committee" or the "IC"). (*Id.* ¶ 3.) Under the Plan, the Investment Committee oversees the Plan's investment options and has the authority to engage an investment manager to assist with investment decisions. (*Id.* ¶ 4; RC's Ex. 1, Jan. 1, 2016, Plan (excerpts) at 68, 71, ECF No. 177-1, 11, 14.)[2] As of 2014, SunTrust advised the 401(k) Plan, which held about $95 million in assets, in a non-fiduciary capacity and Northern Trust managed the Pension Plan, which held about $248 million in assets, as a 3(38) fiduciary.[3] (Pl.'s Resp. Stmt. to RC, ¶¶ 46, 47; Pl.'s Resp. to Russell at 6.) Through a year-and-a-half-long request-for-proposal process, the Investment Committee formally approved the appointment of Russell, for all Royal Caribbean's retirement plans, at an

---

[1] Unless indicated otherwise, the facts presented below are undisputed.

[2] For additional clarity, the Court's pin citations to exhibits will include both an internal document and page identifier, where applicable, as well as the CM/ECF document and page number where the cited material can be located on the Court's docket. The Court's pin citations to briefs will reference only the Court's CM/ECF docketing pagination.

[3] "An investment manager who retains discretion over a plan's assets is considered a fiduciary under ERISA §3(38) and is commonly referred to as a '3(38)' fiduciary." (Pl.'s Ex. 1, Stone Rep. at 11, ECF No. 191-5, 15.)

August 19, 2015, meeting. (Pl.'s Resp. Stmt. to RC ¶ 48; RC's Stmt. ¶¶ 25, 48; Pl.'s Resp. to RC at 9.) Just over a month later, on September 30, the Investment Committee and Russell entered into an investment management agreement (the "IMA") which provided Russell would be a 3(21)-investment advisor[4] for the Plan and a 3(38)-investment manager with respect to the Russell Funds. (RC's Stmt. ¶ 25.) The next day, the Russell Funds were added to the Plan's investment lineup. (*Id.*)

Although there had been internal Royal Caribbean discussions about possibly merging the Pension Plan into the 401(k) Plan, as early as February 2014, by its terms, the 2014-to-2015 RFP nonetheless sought "comprehensive, bundled recordkeeping, administrative and investment management services for certain of their employee benefit plans," including *both* the 401(k) Plan and the Pension Plan. (RC's Reply Stmt. ¶ 7 (quoting RC's Ex. 47, Admin. Rec. at 263, RFP, 177-47, 266); Pl.'s Ex. 76, RFP at 1, ECF No. 186-77, 3; Pls.' Resp. Stmt. to RC ¶ 52 (citing Pl's Ex. 12, Feb. 2014 RC Emails at 943–46).) With respect to the Pension Plan, which had nearly triple the assets as the 401(k) Plan, applicants were directed to address whether their firms could "serve as an Investment Advisor . . . in a fiduciary capacity." (Pl.'s Ex. 76, RFP at 19, ECF No. 186-77, 21; Pl.'s Resp. Stmt. to RC ¶¶ 49, 53.) Despite the ongoing references to merging the plans, the RFP materials considered by the Investment Committee explicitly included information regarding both the 401(k) Plan and the Pension Plan, separately. (RC's Reply Stmt. ¶ 7 (citing RC's Ex. 34, Jan. 13, 2015, RFP Finalists Eval. at slides 4, 7, 8, 10, 177-34, 5, 8–9, 11; RC's Ex. 60, Apr. 15, 2014, Follow-Up Mat. fr. Russell to Royal Caribbean dated Apr. 15, 2014, 177-60, 6, 7, 9 (addressing both plans)).) Indeed, in January and March 2015, an Investment Committee member specifically acknowledged to his colleagues that, although the proposal to merge the plans was ongoing, given the approval-process and implementation lead time, Royal Caribbean would plan to transition the two plans, as is, to the RFP winner and then merge them "down the road" should the merger come to pass. (Pl.'s Resp. Stmt. to RC ¶ 52 (citing Pl.'s Ex. 52, Jan.–Mar. 2015 RC Emails at 604); *see also* Pl.'s Ex. 53, Jan. 13, 2015, Russell Email, ECF No. 186-54, 2.) Ultimately, Royal Caribbean decided to merge the plans less than two months after retaining Russell, in November 2015, and then actually merged the Pension Plan into the Plan on December 31, 2015. (RC's Reply Stmt. ¶¶ 12, 52, 53 (citing RC's Ex. 67, Stone Dep. Tr. 190:5–10, ECF No. 197-3, 27); Pl.'s Resp.

---

[4] "An investment advisor who provides investment advice for a fee is considered a fiduciary under ERISA §3(21) and is commonly referred to as a '3(21)' fiduciary." (Pl.'s Ex. 1, Stone Rep. at 10, ECF No. 191-5, 14.)

Stmt. to RC ¶ 55.) A month later, on January 29, 2016, about $217 million in Pension Plan assets were transferred into the Russell Funds, with about $197 million of that invested in the Russell TDFs. (Pl.'s Resp. Stmt. to RC ¶ 55.)

In initiating the selection process, Royal Caribbean issued its RFP to twelve companies, including relationship banks (Bank of America, Merrill Lynch, BBVA, BB&T, JPMorgan, PNC, and Wells Fargo), mutual fund companies (Vanguard and Fidelity), investment fiduciaries (Northern Trust, Russell, and Wells Fargo), and others (SunTrust Bank and Bank of Montreal). (RC's Stmt. ¶ 8 (citing RC's Ex. 35, Jan. 13, 2015, RFP Presentation at 242, 252, ECF No. 177-34, 5, 24.) Royal Caribbean's benefit counsel, McDermott, Will & Emery ("McDermott"), prepared a memorandum, in June 2014, evaluating the initial response of the eleven vendors who responded to the RFP. (RC's Stmt. ¶ 8 (citing RC's Ex. 29, June 20, 2014, McDermott's Exec. Sum., ECF No. 177-29).) McDermott summarized the various responses, detailing the pros and cons of each respondent, identifying four providers as warranting further consideration: Bank of America Merrill Lynch; SunTrust Bank; Vanguard; and Wells Fargo. (RC's Stmt. ¶ 9 (citing RC's Ex. 29 at 307, June 20, 2014, McDermott's Exec. Sum., ECF No. 177-29, 2).) McDermott also proffered BB&T Bank as a fifth option, should Royal Caribbean want an additional applicant to consider. (RC's Ex. 29 at 307, June 20, 2014, McDermott's Exec. Sum., ECF No. 177-29, 2.) While McDermott did not select Russell for additional consideration, it nonetheless noted Russell's proffer of 3(38) investment manager services and that "Russell's strength is their expertise in providing consulting services and investment advice." (RC's Stmt. ¶ 10.) McDermott also praised the "solid reputation" of Milliman, Russell's recommended administrator, "for providing quality recordkeeping services." (Id.)

Two weeks after McDermott issued its executive summary of the proposals, the RFP Team advised the Investment Committee it had internally selected four potential finalists, three of which were among McDermott's top five: BB&T, SunTrust, and Wells Fargo. (RC's Stmt. ¶ 12 (citing RC's Ex. 30, June 2015 RC Email Exch. at 4543, ECF No. 177-30, 3).) In addition, however, the RFP Team also included Russell on its finalist list—which hadn't even made McDermott's top five. (RC's Stmt. ¶ 12.) In doing so, the RFP Team explained why the other eight invitees were not selected: Bank of Montreal, Bank of America Merrill Lynch, Fidelity, JPMorgan, and Vanguard were excluded because they did not provide 3(38) investment advisor services; Northern Trust did not offer any administrative services and provided an incomplete response to the RFP; BBVA declined to bid; and PNC's proposal was just weaker than the other applicants as to variety of criteria. (RC's Ex. 30, June–July 2014 RC

Email Exch. at 4543, ECF No. 177-30, 3.) The RFP Team identified Russell as a finalist because of what it described as Russell's "strong expertise in consulting services and investment advice." (RC Stmt. ¶ 12.) At the same time, however, the RFP Team echoed McDermott's concerns, set out in the executive summary described above, that, "[o]n the downside," Russell's "pricing was on the high end," Russell required that more than 75% of Plan fund offerings be in Russell funds, and contracting with Russell would require engaging Milliman, Inc., for recordkeeping services. (*Id.* ¶¶ 11, 17; RC's Ex. 30, June 2014 RC Email Exch. at 4544, ECF No. 177-30, 4; RC's Ex. 29 at 310, June 20, 2014, McDermott's Exec. Sum., ECF No. 177-29, 5 (noting the 75% requirement represented a "significant disadvantage" to Russell's proposal).)

In the meantime, during a meeting with SunTrust, in July 2014, the Investment Committee "discussed the various Target Date fund offerings, including historical returns, diversification strategies, management strategies and expense ratios" and decided to select Vanguard TDFs to add to the Plan during the pendency of the RFP. (RC's Stmt. ¶ 16 (quoting RC's Ex. 6, July 29, 2014, Inv. Comm. Mins. at 612, ECF No. 177-6, 3); Pl.'s Resp. Stmt. to RC ¶ 16; RC's Reply Stmt. ¶ 16.)

The four finalists—Russell, BB&T, SunTrust, and Wells Fargo—gave in-person presentations to the Investment Committee on August 12, 2014. (RC's Stmt. ¶ 13.) During that meeting, the Investment Committee "got to meet not only the salespeople, but some of the people behind the scenes" at Russell, affording Royal Caribbean the opportunity "to talk directly . . . to people . . . at Russell whose job it was to . . . select funds . . . and supervise them . . . in terms of their strategies." (*Id.* (quoting RC's Ex. 50, Coronado Dep. Tr. at 189:5–20, ECF No. 177-50, 4).) The slide deck Russell presented contained information as to the makeup of the Russell TDFs and Russell's overall investment strategy. (RC's Stmt. ¶ 14 (citing RC's Ex. 59, Russell's Finalist Presentation, ECF No. 177-59).) Through the presentation, Russell described its "steadfast belief in income replacement" in retirement; the expected income replacement rate in Russell's target glide path; the different characteristics of Russell's glide path as compared to other firms' glide paths—specifically, that Russell's glide path was *to*, rather than *through*, retirement; its multi-manager investment strategy; and its TDFs' focus: "less home country bias, more real assets." (RC's Stmt. ¶ 14 (citing RC's Ex. 59, 177-59).) Russell also recommended, during this pitch, that all the participants in the Plan be re-enrolled into the Russell TDFs. (Pl.'s Resp. Stmt. to RC, ¶ 57.)

Russell submitted follow-up information to the Investment Committee as well. (RC's Stmt. ¶ 15 (citing RC's Ex. 32 (Aug. 2014 Follow-up Letter fr. Russell to McDermott), ECF No. 177-32; RC's Ex. 60 (Attachment to Ex. 32

Follow-up Letter), ECF No. 177-60;[5] RC's Ex. 61 (Oct. 10, 2014, Follow-up
Mats. & Milliman Demo.), ECF No. 177-61).) The follow-up information from
Russell included historical returns for the funds in the proposed 401(k) Plan
lineup—including the Russell TDFs—as compared to their composite index
benchmarks over year-to-date, one-, three-, and five-year horizons, and since
their inceptions. (RC's Stmt. ¶ 16; RC's Ex. 61, Oct. 2014 Follow-up Mats. at
206014, 206016, 206018, 206020, ECF No. 1 77-61, 3, 5, 7, 9; *see also* RC's
Exs. 32 (Aug. 2014 Follow-up Letter) & 60 (Aug. 2014 Follow-up Letter Att.).)

A few months after the finalist presentations, according to the minutes of
a November 2014 Investment Committee meeting, Alan Coronado, one of the
RFP team members "led the Committee through a detailed comparison of the four
finalists across a number of categories, including investment strategy,
employee engagement, cost, recordkeeping processes, reference call feedback
and other considerations." (RC's Stmt. ¶ 18 (quoting RC's Ex. 7, Nov. 5, 2014,
Inv. Comm. Mins. at 1, ECF No. 177-7).) The slide-deck presentation
accompanying that meeting discussed the background of the RFP, summarized
the finalists' proposals across four criteria (investment strategy, employee
engagement, cost, and recordkeeping), included responses from the finalists'
references, and listed various evaluation criteria (for example, whether a
finalist's investment philosophy matched Royal Caribbean's, the finalists' views
on active versus passive management, and the finalists' TDF glide paths). (RC's
Stmt. ¶ 19 (citing RC's Ex. 33, Nov. 4, 2014, RFP Presentation, ECF No. 177-
33).) As set forth in the minutes, after the Investment Committee inquired of
Coronado and the other members of the RFP team regarding the finalists, the
Committee "determined that Russell, along with Russell's recommended
administrator (Milliman), seemed to be the clear winner based upon investment
advisory strength, references, automation and competitive pricing." (RC's Stmt.
¶ 20 (quoting RC's Ex. 7, Nov. 5, 2014, Inv. Comm. Mins. at 1, ECF No. 177-7,
2).)

Notwithstanding the categorical praise the Investment Committee
expressed for Russell according to the November 5-meeting minutes, in just the

---

[5] The first page of this document is dated April 15, 2014. Based on this date, Johnson
characterizes Royal Caribbean's consideration of it as predating McDermott's June 2014
executive summary, described above. (Pl.'s Resp. Stmt. to RC ¶¶ 9, 15.) Conversely, Royal
Caribbean says the April 15, 2014, date is an error as the document was attached to a follow-
up letter Russell sent after the August 12, 2014, final presentation. (RC's Reply Stmt. ¶ 9.)
Aside from the April 2014 date printed on the document, Johnson supplies no evidence that
Royal Caribbean was aware of it until it was attached to Russell's August 2014 letter. In other
words, Johnson has not supplied any record evidence that Russell presented this information
to Royal Caribbean before the RFP was ever issued—regardless of the date it was actually
created.

days prior, such unqualified support for Russell was not as forthcoming. (Pl.'s Resp. Stmt. to RC ¶ 20.) For example, in various Royal Caribbean email exchanges about the RFP process, leading up to the November 5 meeting, RFP Team members expressed support for switching to Russell for the Pension Plan, to replace Northern Trust, describing Russell and Milliman as "consummate professionals," but, at the same time, recommended staying with SunTrust for the 401(k) Plan and using the RFP process to try to leverage lower fees. (Pl.'s Resp. Stmt. to RC ¶ 20 (citing Pl.'s Ex. 29, Nov. 4–5, 2014 email exchange, 186-30, 2–3; Pl.'s Ex. 30, Nov. 3, 2014, email exchange, 186-30, 3).) Indeed, one Investment Committee member, testified that one reason Russell was selected was because of its ability "to manage a portfolio of investments," like Northern Trust did with respect to the Pension Plan. (Pl.'s Resp. Stmt. to RC ¶ 20 (citing Pl.'s Ex. 28, Hernandez Dep. 91:23–92:3).) One of the slides of the Investment Committee's RFP presentation, also focused only on comparing Russell's historical performance to the performance of the Pension Plan. (Pl.'s Resp. Stmt. in RC ¶ 22 (citing Pl.'s Ex. 31, Dec. 2, 2014, RFP Finalists Eval. at slide 23, ECF No. 191-15, 24; RC's Ex. 34, Jan. 13, 2015, RFP Finalists Eval. at slide 23, 177-34, 24).)[6] Despite identifying Russell as the "clear winner," the Investment Committee nonetheless sought additional information from Russell before finalizing its decision, including "a list of non-Russell funds that Russell would suggest for inclusion in the 401(k) line-up" and "an indication of how inclusion of these funds would impact the price." (RC's Stmt. ¶ 20 (quoting RC's Ex. 7, Nov. 5, 2014, Inv. Comm. Mins. at 2, ECF No. 177-7, 3).)

This follow-up information was referenced during a November 12, 2014, Investment Committee meeting, the minutes of which specify the meeting was focused on the Pension Plan. (RC's Stmt. ¶ 21 (citing RC's Ex. 8, Nov. 12, 2014, Inv. Comm. Mins. at 1–2, ECF No. 177-8, 2–3).) At that meeting, the Investment Committee "determined it important to address a few additional questions regarding Milliman," but at the same time noted that, "[s]ubject to satisfactory receipt of this information," "the next step" would be to get Royal Caribbean's Chief Financial Officer's support to select "Russell/Milliman as the investment manager and administrator . . . for the [Pension] Plan and the 401(k) Plan." (RC's Stmt. ¶ 21 (quoting RC's Ex. 8, Nov. 12, 2014, Inv. Comm. Mins. at 2, ECF No. 177-8, 3).)

As shown in Royal Caribbean's January 13, 2015, "RFP Finalists Evaluation," for both the Pension Plan and the 401(k) Plan, Russell appeared to

---

[6] These two presentations appear the same except for the dates appearing on the first slide. Neither party has highlighted any material differences or explained the mismatched dates (December 2, 2014, versus January 13, 2015).

offer the second-lowest fees, for the two plans combined, of the four finalists. (RC's Stmt. ¶ 24; RC's Ex. 34, Jan. 13, 2015, RFP Finalists Eval. at slide 7, ECF No. 177-34, 8.) On the other hand, Royal Caribbean's counsel prompted Royal Caribbean to seek a "most favored nations" provision to guarantee that Russell offered its best fee schedule to Royal Caribbean but there is no indication Royal Caribbean ever did so. (Pl.'s Resp. Stmt. to RC ¶ 24 (citing Pl.'s Ex. 32, IMA Draft at § 11, ECF No. 186-33, 12; RC's Ex. 38, IMA dated Sep. 30, 2015, at § 11, ECF No. 177-38, 11.) Indeed, in August 2017, the Plan was paying between seven and ten basis points ("bps") more for Russell's TDFs relative to "similar size clients," despite Royal Caribbean's being the Russell TDFs' largest investor. (Pl.'s Resp. Stmt. to RC ¶ 24 (citing Pl.'s Ex. 33, Aug. 2017 Russell Emails re RC Fees at 209182, ECF No. 191-16, 3; Pl.'s Ex. 34, Russell's Assets Under Management, ECF No. 186-35).) Relative to Royal Caribbean's legacy Vanguard TDFs, the Russell TDFs were about thirty bps more expensive (more than double). (Pl.'s Resp. Stmt. to RC ¶ 24.) There is no evidence in the record that Royal Caribbean negotiated Russell's fees to ensure that it was not overpaying or that it was even aware it was overpaying. (Pl.'s Resp. Stmt. to RC ¶ 24.) Nor did Royal Caribbean consider how changing the Pension Plan to a self-directed vehicle would alter the price rankings of the various RFP respondents. (Pl.'s Resp. Stmt. to RC ¶ 24 (citing RC's Ex. 36, Jan. 23, 2015, RC Email Exchange Re: RFP at 326, ECF No. 177-36, 4).)

In that same presentation document, Royal Caribbean noted Russell's "investment advisory strength," "[s]trong expertise in consulting services," and "[v]ery strong research" capabilities. (RC's Stmt. ¶ 24; RC's Ex. 34, Jan. 13, 2015, RFP Finalists Eval. at slides 6, 11, 17, ECF No. 177-34, 7, 12, 18.) That report also recognized that "Russell's references w[]ere the most professional" of the four finalists and that, at the time, Russell was the largest provider of outsourced chief investment officer services in the world. (RC's Stmt. ¶ 24; RC's Ex. 34, Jan. 13, 2015, RFP Finalists Eval. at slides 5, 15 ECF No. 177-34, 6, 16.) At the same time, the presentation also noted that among Russell's "downside[s]," were that it would require, as McDermott had pointed out, more than 75% of the Plan assets to be in Russell funds. (RC's Stmt. ¶ 17; RC's Ex. 34, Jan. 13, 2015, RFP Finalists Eval. at slide 17, ECF No. 177-34, 18.)

Ultimately, as reflected in the minutes for the January 13, 2015, Investment Committee meeting, the Committee discussed the RFP finalists "across a number of categories, including investment strategy, employee engagement solutions, cost, recordkeeping solutions and quality/feedback of references." (RC's Ex. 9, Jan. 13, 2015, IC Meeting Minutes at 154, ECF No. 177-9, 2.) The minutes also reflect that the "Committee discussed the advantages/disadvantages of each finalist in detail and had an opportunity to

ask, and did ask, questions of management regarding the various evaluation criteria." (*Id.*)

In following up with Russell, after the January 13 RFP Evaluation meeting, Royal Caribbean inquired as to Russell's sophistication regarding actively managed funds. (RC's Stmt. ¶ 23 (citing RC's Ex. 35, Jan. 13, 2015, Email Exch. Between Russell and Royal Caribbean at 322, ECF No. 177-35, 3).) In particular, Royal Caribbean was looking "to ensure that Russell is as sophisticated as Northern Trust at least." (RC's Ex. 35 at 322, ECF No. 177-35, 3.) In response, Russell confirmed its focus on active investment management, noting that "[o]ut of the $115 billion in [Russell's] AUM, only $6.1 billion is in 'index' strategies." (*Id.*; RC's Ex. 36, Jan. 23, 2015, Internal RC Email Exch. at 325 (confirming that most of Russell's AUM "are not just passively invested in index funds with little need for investment expertise").)

The chair of the Investment Committee, Antje Gibson, expressed in a memo, regarding the RFP, how impressive Russell's expertise was based on its "thought leadership," including bringing new ideas to the table such as diversification by investing in real assets and emerging markets, noting that "[b]oth Russell and Milliman appear near or at the top of various rankings from industry publications." (RC's Stmt. ¶ 24 (citing RC's Ex. 37, June 16, 2015, Memo re RFP at 316, ECF No. 177-37, 3).) In that same June 2015 memo, Gibson detailed what she thought were the benefits of selecting Russell (and Milliman, as the recordkeeper), pointing out the reduction of participant fees, the automation of employee processes, and Russell's "market leading expertise," underscored by one of Russell's executives serving on the Department of Labor's ERISA Advisory Council. (RC's Stmt. ¶ 24 (citing RC's Ex. 37, June 16, 2015, Memo re RFP at 315–16, ECF No. 177-37, 2–3).) Gibson further noted that "[b]oth Russell and Milliman appear near or at the top of various rankings from industry publications." (RC's Ex. 37, June 16, 2015, Memo re RFP at 316, ECF No. 177-37, 3.) As to the 401(k) Plan specifically, Gibson noted she expected Russell to "act as a 3(21) co-fiduciary . . . meaning that as an investment advisor [Russell] will be responsible for providing recommendations on fund line-ups and will share fiduciary responsibility with [Royal Caribbean]." (Pl.'s Resp. Stmt. to RC ¶ 59 (quoting RC's Ex. 37, June 16, 2015, IC Memo re the RFP at 315, ECF No.177-37, 2).) Indeed, the Investment Committee would not have initially selected Russell as a finalist if it knew Russell did not intend to provide 3(21) services as to the selection and monitoring of the Plan's investments. (Pl.'s Resp. Stmt. to RC ¶ 59 (citing Pl.'s Ex. 50, Levine Dep. Tr. 75:13–17).)

As to results, at the time Russell was selected, in September 2015, "the Russell TDFs performed in line with, and in many cases outperformed, their

respective composite benchmarks since inception of each TDF vintage." (Russell's Stmt. ¶ 34, ECF No. 180, 6; *see* Pl.'s Resp. Stmt. to Russell ¶ 34 ("Undisputed"); RC's Reply Stmt. ¶ 18.) On the other hand, one of Johnson's experts, Dr. Steve Pomerantz, opined that the Russell TDFs "had inferior characteristics with respect to the commonly used risk, return, and risk-adjusted return metrics." (Pl.'s Resp. Stmt. to RC ¶ 24 (citing Pl.'s Ex. 5, Pomerantz Rep. at 7, ECF No. 186-6, 5).) Pomerantz also noted that, "[s]ince their inception through the beginning of the class period, Russell's target-date funds were inferior to both the Vanguard and American Funds target-date funds . . . from a risk, return, and risk-adjusted return perspective." (Pl.'s Resp. Stmt. to RC ¶ 24 (citing Pl.'s Ex. 5, Pomerantz Rep. at 3).) Further, said Pomerantz, "at the time the Russell TDFs were added to the Plan in 2015, all vintages of the Russell [TDFs] had underperformed their Vanguard and American Fund counterparts considerably." (Pl.'s Resp. Stmt. to RC ¶ 24.) During the RFP period, Morningstar gave the "Russell LifePoints Target Date Series Target-Date Fund Series" (notably, *not* the Russell TDFs that were included in the Plan) its lowest rating at the end of 2014: "negative." (*Id.*; Pl.'s Ex. 11, Morningstar Rep. at 119584, ECF No. 186-12, 2; Russell's Reply Stmt. ¶ 52.) Further, Barron's/Lipper ranked Russell last out of forty-eight companies in long-term (ten-year) fund manager ranking as of year-end 2014 with respect to Russell's mutual funds (again, not the TDFs at issue here). (Pl.'s Resp. Stmt. to RC ¶ 24; Pl.'s Ex. 37, Barron's/Lipper Rankings Feb. 7, 2015, at 1031, ECF No. 186, 38, 12; Russell's Reply Stmt. ¶ 52; RC's Reply at 8 n. 5.)

The executed IMA included several provisions addressing Russell and the Investment Committee's obligations. To begin, broadly, "Russell . . . acknowledge[d] that it is a fiduciary within the meaning of Section 3(21) of ERISA with respect to the Plan." (Pl.'s Resp. Stmt. to Russell ¶ 10 (citing Russell's Ex. 6, IMA § 1.2, ECF No. 181-17, 4).) Further, Russell was engaged as an "investment manager" as to the "Investment Account," which was defined as consisting "of those assets transferred" into it as directed by the Investment Committee. (Russell's Stmt. ¶ 10 (citing Russell's Ex. 6, IMA § 1.1, ECF No. 181-17, 4).) Under the IMA, Russell was required to "invest the assets of the Investment Account in the specific funds" and "in the proportions" set forth in an "Allocation Certificate and Rebalance Authorization, delivered to [Russell] by the [Investment Committee]." (Russell's Stmt. ¶ 11 (quoting Russell's Ex. 6, IMA § 2.1(a), ECF No. 181-17, 5).) The Investment Committee, prior to the IMA's execution, had delivered an Allocation Certificate to Russell, directing Russell to invest the Investment Account's assets solely in Russell's TDFs and five Asset Class Funds: the Russell 1000 Index Fund, the Russell Small Cap Fund, the Russell All international Markets Fund, the Russell RITC Multi-

Manager Bond Fund, and the Russell Investment Contract Fund. (Russell's Stmt. ¶ 15.)

The IMA also provided Russell "shall not be liable for any act or omission" of the Investment Committee in managing the Plan's assets. (*Id.* ¶ 12 (quoting Russell's Ex. 6, IMA § 2.1(d), ECF No. 181-17, 5).) Indeed, as the IMA set forth, the Investment Committee was "solely responsible for assuming that the allocation and rebalancing directions as provided in the Certificate are prudent for the Investment Account assets." (Russell's Stmt. ¶ 13 (quoting Russell's Ex. 6, IMA § 2.2(a)(ii), ECF No. 181-17, 6); *see also* Russell's Ex. 6, IMA § 2.2(a)(iii) ("[T]he decision to allocate any assets of the Plan to the Investment Account is *solely* the responsibility of the [Investment Committee].") (emphasis added).) As the IMA specified, Russell had "only such duties with respect to the Plan as are specified in the [the IMA]" and had "no obligation to review or conduct further inquiry on any Certificate and may rely on a Certificate until such time as a substitute Certificate is received by [Russell] from the [Investment Committee]." (Russell's Stmt. ¶ 14 (quoting Russell's Ex. 6, IMA § 2.1(a), (d), ECF No. 181-17, 5).)

When compared to the gains of the Plan's legacy Vanguard TDFs and replacement American Funds TDFs, Russell's TDFs underperformed, on an annualized basis, by an average of 1.51% and 2.12%, respectively, from the time of engagement, in October 2015, until Russell was terminated, in May 2019. (*E.g.*, Russell's Mot. at 13; Russell's Stmt. ¶ 36.) During that same period, the Russell TDFs underperformed their composite benchmarks in amounts ranging from 0.38% to 0.97% on an annualized basis. (Russell's Stmt. ¶ 35.)

Throughout the class period, internal discussions reflected dissatisfaction on both sides. For example, just over a year after executing the IMA, Russell griped, internally, that Royal Caribbean was "hating the longer term percentiles for the TDFs." (Pl.'s Resp. Stmt. to RC ¶ 24; Pl.'s Ex. 38, Oct. 27, 2016, Russell Email Exch. at 40432, ECF No. 186-39, 4.) Also, attached to an internal Russell email exchange from the spring of 2017 is a Russell report regarding its relationship with Royal Caribbean, titled "Client Review and Planning Strategy," "as of October 2016." (Pl.'s Ex. 3, Russell Email Exchange w. Rep. Attach., ECF No. 191-6.) In the report, Russell questioned "how much attention [w]as paid to TDF philosophy and in particular results," with the author noting she "suspect[ed] almost none." (Pl.'s Ex. 3, Rep. at 15604, ECF No. 191-6, 10.) The author also noted that, since the merger of Royal Caribbean's Pension Plan into the 401(k) Plan, resulting in "85% of AUM in TDFs now," "all eyes are on the TDFs for the first time." (Pl.'s Ex. 3, Rep. at 15604, ECF No. 191-6, 10.) A few months prior, during a January 2017

internal email exchange, preparing for an upcoming meeting with and presentation to Royal Caribbean, Russell's Stacey Bro, Russell's senior relationship manager, expressed her concern that Royal Caribbean "need[ed] to better understand the glidepath philosophy" to be able to "reconcile periods of periodic underperformance relative to peers not equating to their not meeting goal over long term." (Pl.'s Resp. Stmt. to RC ¶ 24 (citing Pl.'s Ex. 35, Jan. 2017 Russell Email Exch. at 32548, ECF No. 186-35, 3).) Bro also observed, within that same email string, that "based on longer-term historical peer relative performance," Royal Caribbean thinks it has "made a bad fiduciary decision." (Pl.'s Resp. Stmt. to RC ¶ 24 (citing Pl.'s Ex. 35, Jan. 2017 Russell Email Exch. at 32547, ECF No. 186-35, 2).) And then later documents show Russell's recognition of its underperformance relative to its peers. (Pl.'s Resp. Stmt. to RC ¶ 24.) For example, in a "Product Objectives and Requirements" document from March 2018, Russell acknowledged serious concerns relating to its "[u]ncompetive industry rankings." (Pl.'s Ex. 9, Mar. 18, 2018, Russell Prod. Objs. & Reqs at 144557, ECF No. 186-10, 2.)

Despite the underperformance, and these and other various internal discussions, sometimes heated, within both Russell and Royal Caribbean, about the Russell TDFs' performance, Royal Caribbean did not terminate the relationship with Russell until May 2019, when it replaced the Russell TDFs with TDFs managed by American Funds. (Pl.'s Resp. to Russell at 10.)

### 2. **Legal Standard**

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007). Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the record as a whole could not lead a rational trier of fact to find in the nonmovant's favor, there is no genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and

present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248 (citation omitted). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Bd. of Regents of Univ. of Ga.*, 2011 WL 5903518, at *2 (11th Cir. Nov. 22, 2011). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita*, 475 U.S. at 586.

### 3. Analysis

Both Royal Caribbean and Russell move for summary judgment. Among the reasons Royal Caribbean maintains it is entitle to summary judgment are (1) the record shows that Royal Caribbean employed diligent and reasonable processes in both selecting Russell and the Russell funds as well as monitoring Russell and the performance of its funds; (2) Johnson cannot meet her burden of showing that the Russell Funds were objectively impudent investments; and (3) Johnson's derivative claim against Royal Caribbean itself for breach of the duty to monitor the Investment Committee, along with co-fiduciary liability, fail because there is no underlying breach of fiduciary duty.[7] (RC's Mot. at 6–7.)

Russell's position is related but also distinct in key respects. *First*, Russell argues that, although it was a fiduciary to the Plan, it was not a fiduciary, under the IMA, with respect to the conduct Johnson challenges: the selection of the Russell Funds in 2015 and their retention until the Investment Committee removed them from the Plan in 2019. (Russell's Mot. at 15–17.) *Second*, Russell also submits that, even if it did have a duty of prudence as to the selection and retention of the Plan's investment options, the record would not permit a reasonable factfinder to conclude that the Russell Funds were imprudent choices for the Plan. (*Id.* at 17–22.) *Third*, Russell says that Johnson's claim that Russell breached its duty of loyalty fails because (A) Russell, again, had no fiduciary duty to the Plan in connection with the selection or retention of the Russell funds and, moreover, (B) Russell's

---

[7] Royal Caribbean also argues that the Court should "limit its review to the reasonableness of the Administrative Committee's denial of [Johnson's] administrative claim based on the Administrative Record." (RC's Mot. at 14.) Royal Caribbean also maintains that, because Johnson never challenged the administrative denial of her claim, she has waived her ability to do so now. The Court is not persuaded. Nothing in the facts of this case, statutory requirements, binding precedent, or even persuasive precedent, would lead the Court to look to a corporate defendant's own internal "administrative" decision to evaluate a claim that that very same corporate defendant breached its fiduciary duty to the plaintiff.

recommendation, or requirement, of selecting the Russell Funds, was made to Royal Caribbean during the sales process. (*Id.* at 23.) And *fourth*, Russell argues that the record fails to establish proximate cause, as to Russell, for the additional reason that Russell itself never had any discretionary authority to select or retain the Russell funds. (*Id.* at 24.)

Johnson opposes both motions. In response to Royal Caribbean, Johnson focuses on evidence in the record that she says definitively demonstrates, from the start of the RFP until Russell was terminated, Royal Caribbean's lack of prudence in selecting and monitoring Russell and the Russell Funds. (Pl.'s Resp. to RC at 7.) She points to several overt missteps, as well as numerous oversights and omissions, that she says led to Royal Caribbean's selection of a conflicted advisor and poorly performing funds. (*Id.* at 20–22.) Johnson also insists that the record evidence would permit a factfinder to conclude that Royal Caribbean's breaches caused losses to the plan. In support, she compares the performance of the Russell funds to not only Russell's own benchmark, but to both the Vanguard TDF legacy funds they replaced and to the American Fund TDFs that replaced the Russell funds as well. In addition, she recites her expert's characterization of the evidence in the case to show that no prudent fiduciary would have replaced Royal Caribbean's existing managers and funds with Russell and its funds. (*Id.* at 25.)

As to Russell's motion, Johnson relies on evidence in the record she says shows that, despite any language limiting Russell's liability in the IMA, Russell retained comprehensive fiduciary responsibilities for advising Royal Caribbean on fund monitoring and retention. (Pl.'s Resp. to Russell at 11–15.) And then, based on those responsibilities, says Johnson, there is evidence from which a factfinder could infer that Russell breached its fiduciary duties by (1) failing to place the Russell TDFs on a watch list for Royal Caribbean and then failing to recommend that any of the Russell TDFs be removed; and (2) being motivated by disloyal self interest based on its own business concerns. (*Id.* at 16–20.) Johnson further points to her and Russell's differing views on the proper comparators by which the performance of the Russell TDFs should be measured as a genuine issue of material fact requiring a trial. (*Id.* at 20–23.) Finally, Johnson maintains that the record contains ample evidence from which a reasonable factfinder could conclude that Russell's breaches were the proximate cause of the Plan's losses. (*Id.* at 23–24.)

After careful review, the Court agrees with both Defendants that Johnson has failed to adduce evidence sufficient to establish a genuine issue of material fact requiring a trial on whether the investments at issue were objectively

imprudent. The Court also finds that Russell is, in any event, shielded from liability, under the IMA, for the specific claims in this case.

**A. Based on the record, there is no genuine issue of material fact as to the objective reasonableness of the selection of the Russell TDFs for the Plan.**

The Court begins, and, for the most part, ends, by analyzing the Defendants' arguments that Johnson has not identified any evidence supporting her position that the selection of the Russell funds was objectively unreasonable.

Under ERISA, a fiduciary's "liability turns not only on an imprudent process, but also on that process *resulting* in an imprudent investment." *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1176 (11th Cir. 2024) (emphasis added). Accordingly, even if Johnson can establish a genuine issue of material fact as to Royal Caribbean's *process* for selecting and retaining Russell or the Russell funds (or Russell's management of those funds), she cannot ward off summary judgment unless she can also show that the chosen investments fall "outside the 'range of reasonable judgments a fiduciary may make based on her experience and expertise,' such that a hypothetical prudent fiduciary in the same circumstances as the defendant, armed with the information that a proper evaluation would have yielded, would not (or could not) have made the same choice." *Id.* (quoting, in part, *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022)). "Determining whether a loss occurred as a result of the fiduciaries' breach of duty requires a comparison between the challenged plan's actual performance and performance that would have otherwise occurred—*e.g.*, performance according to models a [c]ourt accepts as reasonable." *Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1286 (N.D. Ga. 2022), *aff'd,* 111 F.4th 1165 (11th Cir. 2024). While the parties do not identify much guidance as to "models" that the Court might find acceptable, the Defendants identify binding authority for the types of evidence that is *not* acceptable. For example, a plaintiff "cannot show that a fund is objectively imprudent by just pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years." *Pizarro*, 111 F.4th at 1180 (cleaned up). That is, "the objective prudence of a long-term retirement option cannot be measured only by referencing short-term shifts in the market." *Id.* at 1181 (maintaining that "short periods of relative underperformance alone do not meet a plaintiff's burden to establish objective imprudence"). Nor is a comparison of "apples and oranges" deemed useful: for instance, "[t]arget date funds are not all created equal—funds from different sponsors may have different glide paths, which means they also have different

risk-return profiles." *Id.* at 1180; *see also Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022) ("A side-by-side comparison of how two funds performed in a narrow window of time, with no consideration of their distinct objectives, will not tell a fiduciary which is the more prudent long-term investment option.") (citing *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the outset.")).

The Defendants' positions as to loss causation is essentially two-fold. *First*, they maintain that Johnson's proffered comparators do not provide an "apples-to-apples comparison" from which a reasonable factfinder could conclude that no hypothetical prudent fiduciary would have selected and retained the Russell TDFs. (RC's Mot. at 22–24; Russell's Mot. at 20–22.) And *second*, the Defendants point to the only apples-to-apples comparison in the record—Russell's custom TDF benchmark—which shows (1) a favorable performance of the Russell TDFs at the time they were selected and (2) only insignificant underperformance during the class period. (RC's Mot. at 24; Russell's Mot. at 21–22.) The Court finds both points persuasive.

### (1) Improper Comparators

To begin, there are a several significant, and largely undisputed, differences between Johnson's proffered comparators—Vanguard TDFs and American Funds TDFs ("Johnson's Comparator Funds")—and the Russell TDFs that Royal Caribbean selected. (*See* Pl.'s Resp. to Russell at 22 ("It is true that the Vanguard and American TDFs are designed for different purposes and thus choose their investments differently than the Russell TDFs, so there is no reason to expect them to make similar returns over any given span of time.")

One, the Russell TDFs employed a hybrid strategy, investing in both active as well as passive funds. (RC's Stmt. ¶41; Pl.'s Resp. Stmt. to RC ¶ 41 ("Undisputed").) In contrast, the Vanguard TDFs are invested solely in passive funds while the American Funds TDFs are invested solely in active funds. (RC's Stmt. ¶41; Pl.'s Resp. Stmt. to RC ¶ 41 ("Undisputed").) Such a comparison, then, is problematic because active and passive investment vehicles "have different aims, different risks, and different potential rewards that cater to different investors. Comparing apples and oranges is not a way to show that one is better or worse than the other." *Davis v. Washington U. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020); *see also Luckett v. Wintrust Fin. Corp.*, No. 22-CV-03968, 2024 WL 3823175, at *4 (N.D. Ill. Aug. 14, 2024) ("Comparing index funds to managed funds is a textbook "apples-to-oranges" comparison.").

Two, the Russell TDFs had a "to" glide path, meaning each of the Russell TDFs reached their minimum equity allocation *at* the expected retirement date. (RC's Stmt. ¶42; Pl.'s Resp. Stmt. to RC ¶ 42 (disputing unrelated aspects of Royal Caribbean's statement).) Conversely, Johnson's Comparator Funds had "through" glide paths which did not reach their minimum equity allocations until five or ten years *after* the expected retirement date. (RC's Stmt. ¶42; Pl.'s Resp. Stmt. to RC ¶ 42 (disputing unrelated aspects of Royal Caribbean's statement).) In other words, the Russell TDFs took significantly less equity risk than the Johnson Comparator Funds—both *before* the target retirement date, *at* the retirement date, and *after* the target retirement date. (RC's Mot. at 22.) As the Eleventh Circuit has recently pointed out, comparing the performances of funds that have different glide paths also amounts to an "apples and oranges" comparison, noting that the funds will have different risk-return profiles and "ERISA does not require that fiduciaries choose the maximally aggressive option in each investment class." *Pizarro*, 111 F.4th at 1180.

And three, the Russell TDFs had a fundamentally different asset allocation than Johnson's Comparator Funds. For example, the Russell TDFs had a lower asset allocation to U.S. equities and generally a higher asset allocation to emerging market equities than the Comparator Funds. (RC's Stmt. ¶43; Pl.'s Resp. Stmt. to RC ¶ 43 ("Undisputed").) Moreover, the Russell TDFs' diversification strategy also included investments in real assets such as global infrastructure, global commodities, and global real estate, while Johnson's Comparator Funds did not invest at all in real assets. (RC's Stmt. ¶43; Pl.'s Resp. Stmt. to RC ¶ 43 ("Undisputed").) Because of these differences, the Court agrees with the Defendants that performance comparisons between the Russell TDFs and Johnson's Comparator Funds are inapt: "The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether [a defendant's chosen] TDFs were an imprudent choice at the outset." *Meiners*, 898 F.3d at 823; *Smith*, 37 F.4th at 1167 (rejecting the plaintiff's proposed comparator funds even though they were "sponsored by the same company, managed by the same team, and use a similar allocation of investment types" because "each fund has distinct goals and distinct strategies, making them inapt comparators").

Again, Johnson doesn't dispute the differences between the Russell TDFs and her Comparator Funds. Instead, she argues that the very fact that Royal Caribbean itself selected the Vanguard and American Funds TDFs (prior to Russell's engagement and right after, respectively), renders them "particularly appropriate comparators." (Pl.'s Resp. to RC at 23.) In doing so, Johnson conflates the measurement of a plaintiff's damages, once a breach has been established, with loss causation—an element of establishing a breach in the

first place. Indeed, every one of the several citations she supplies, supposedly in support of her theory, addresses loss *measurement,* not loss *causation. E.g. Donovan v. Bierwirth*, 754 F.2d 1049, 1052 (2d Cir. 1985) ("The chief issue presented for our review concerns the applicable measure of damages."); *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008) (noting that "*[l]osses to a plan from breaches of the duty of prudence may be ascertained* . . . by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio")[8] (emphases added); *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (evaluating the "measure of damages"); *Fuller v. SunTrust Banks, Inc.*, No. 1:11-CV-784-ODE, 2019 WL 5448206, at *28 (N.D. Ga. Oct. 3, 2019) (addressing various "methods for damages calculations approved by courts"); *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 31 (1st Cir. 2018) (evaluating the "appropriate comparator for loss calculation purposes"). Johnson fails to address how these cases, endorsing the use of an apples-to-oranges comparison in the context of *measuring the quantum of damages,* help her get around the Eleventh Circuit's disapproval of relying on an "apples and oranges" comparison to demonstrate that an investment was objectively imprudent. *Pizarro*, 634 F. Supp. 3d at 1294, *aff'd,* 111 F.4th 1165 (11th Cir. 2024) (affirming the district court's grant of summary judgment in the defendant fiduciary's favor where the district court found that "apples and oranges comparisons are disfavored time and again") (cleaned up).

Instead, she points to language in *Pizarro* evaluating the plaintiff plan beneficiary's argument, in that case, that an apples-to-oranges comparator was valid. In response, the Eleventh Circuit explained that "whether an investment is objectively imprudent must be assessed against the actions of a hypothetical prudent fiduciary with 'like aims.'" *Pizarro*, 111 F.4th at 1181. Johnson interprets this to mean that, since "the Committee's primary objectives were to offer top performing funds and outperform the legacy fund roster," "[t]here can be no better comparison for the Russell TDFs than the funds they replaced and the funds that replaced them." (Pl.'s Resp. to RC at 24, 24 n. 10.) While there may be some appeal to this idea, played out to its logical conclusion, it falls apart. For instance, under Johnson's theory, any time a fiduciary's chosen investment can be described as "underperforming," in some way, compared to its predecessor or replacement investment, the choice would be automatically deemed imprudent. Johnson's understanding would also collapse the analysis of the fiduciary's *process* into the evaluation of the objective *result* of that process, defeating the whole purpose of the objective-prudence prong of the

---

[8] Whether through inadvertence or otherwise, Johnson omitted the italicized portion of this quotation from her response brief.

inquiry: "liability turns not only on an imprudent process, but also on that process resulting in an imprudent investment." *Pizarro*, 111 F.4th at 1176 (recognizing that "an imprudent process can sometimes yield a prudent investment" whether "through prayer, astrology or just blind luck"). And so, without any other real argument from Johnson as to why her Comparator Funds should be used to establish Royal Caribbean's objective imprudence, the Court finds Johnson's reliance on them unavailing. *See Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022) (requiring that a beneficiary plaintiff establish a "sound basis for comparison" in order for the court to consider a benchmark "meaningful"); *Luckett*, 2024 WL 3823175 at *4 ("[C]ourts cannot, and should not, compare apples to oranges when determining a meaningful benchmark for performance. Neither the T. Rowe nor the Vanguard TDFs provide an appropriate benchmark, even though they were alternatives the Committee considered at the time of selection.")

### (2) Proper Comparator

On the other hand, both parties agree that Russell's custom TDF benchmark is an appropriate apples-to-apples comparator. And there is similarly no dispute that, at the time the Russell TDFs were added to the Plan's investment lineup, their returns *exceeded* the returns of the corresponding benchmark. (RC's Stmt. ¶44; Pl.'s Resp. Stmt. to RC ¶ 44 (not commenting on this aspect of Royal Caribbean's statement); RC's Stmt. ¶ 16 ("The historical performance returns showed that the Russell TDFs typically performed in line with their benchmark."; Pl.'s Resp. Stmt. ¶ 16 (not commenting on this aspect of Royal Caribbean's statement); Russell's Stmt. ¶ 34 ("As of September 2015, the Russell TDFs performed in line with, and in many cases outperformed, their respective composite benchmarks since inception of each TDF vintage."; Pl.'s Resp. Stmt. to Russell ¶ 34 ("Undisputed").) Where the tracks diverge is the parties' respective evaluations of the import of the Russell TDFs' underperformance, relative to the custom benchmark, later in the class period.

Johnson insists that any underperformance at all, no matter how slight it may be, especially when measured against a firm's "failing to meet its own custom measure," is meaningful. (Pl.'s Resp. to RC at 24.) The Court is not convinced.

Importantly, Johnson herself does not dispute that "[t]he Russell TDFs' underperformance relative to their benchmark was not significant during the Class Period." (RC's Stmt. ¶44; Pl.'s Resp. Stmt. to RC ¶ 44 (not commenting on

this aspect of Royal Caribbean's statement).)[9] Without more, then, the Court agrees with other courts that have found that, to trigger a finding of objective imprudence, "the comparative underperformance must generally be 'consistent' and 'substantial' to support an inference of imprudence." *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 163–64 (E.D.N.Y. 2022) (finding average underperformance of three- and five-year rolling bases ranging up to 2.57% was "not the type of substantial underperformance over a lengthy period that gives rise to a plausible inference that a prudent fiduciary would have removed these funds from the plan's menu of options."); *see also Cho v. Prudential Ins. Co. of Am.*, No. CV 19-19886 (JMV) (SCM), 2021 WL 4438186, at *9 (D.N.J. Sept. 27, 2021) (finding that an underperformance rate of up to 3.71% was not "sufficiently substantial" and dismissing case); *Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 753, 764 (S.D. Ohio 2021) (finding "variances identified by Plaintiffs"—of up to just over 2%—"are simply too small"), *aff'd in part, rev'd in part, on other grounds, and remanded,* 40 F.4th 443 (6th Cir. 2022).

Johnson's sole quarrel with these cases is that they were decided in the context of a motion to dismiss. She fails, however, to explain why, with respect to this issue, the procedural posture of the case matters. If anything, to the extent factual allegations are deemed insufficient to state a claim at the motion-to-dismiss stage, evidence supporting those allegations would be considered even less compelling at the summary-judgment stage. In other words, if allegations of insignificant losses are inadequate in a pleading, relying on evidence showing insignificant losses would be insufficient to ward off summary judgment (or prevail at trial). *See Pizarro*, 111 F.4th at 1180 (citing *Smith*, 37 F.4th at 1166 in which the court found that a plaintiff failed to state a claim because, in trying to establish objective imprudence, he merely pointed "to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years").

### (3) Other Evidence of Alleged Objective Imprudence

Lastly, Johnson turns to what she calls a "plethora of evidence" to show that no prudent fiduciary would have hired Russell or selected or retained the Russell funds. The evidence she points to includes that Royal Caribbean (1) hired Russell "against attorney advice"; (2) "put 80% of the Plan's assets in an unpopular TDF with less than $1.5 billion" in assets under management; (3) selected assets "performing in the bottom quartile of their peers"; (4) selected

---

[9] There is no dispute that "[d]uring the less than four-year class period, the Russell TDFs underperformed their composite benchmarks in amounts ranging from 0.38% to 0.9[7]% on an annualized basis. (Russell's Stmt. ¶35; Pl.'s Resp. Stmt. to Russell ¶ 35 (correcting 0.98% to 0.97% and adding that the asset-weighted average underperformance was 0.71%).)

assets "managed by a disfavored TDF management team with a near bottom ranking among investment management firms"; and (5) replaced "a highly popular, gold-rated TDF, with $191 billion in AUM, performing in the top percentiles among its peers, managed by a top ranked investment management firm." (Pl.'s Resp. to RC at 25.) Johnson also points to an alleged "mismatch between Russell's preferred strategy and Royal Caribbean's investment objectives" along with internal Russell documents describing the TDFs' performance as "uncompetitive," "disappointing," "god awful," and "horrific." (Pl.'s Resp. to Russell at 20–21.) Even if all these allegations were supported by the record—they are not—they nonetheless miss the mark. Just as no prudent fiduciary would rely on "prayer, astrology or just blind luck," such a misguided fiduciary will nonetheless be shielded from liability if a beneficiary is unable to show that the resulting investment is also imprudent.[10] *Pizarro*, 111 F.4th at 1176. The evidence recounted above simply rehashes Johnson's complaints about Royal Caribbean's allegedly faulty selection and retention process and Russell's alleged internal missteps; none of it establishes that the resulting investment itself was objectively imprudent.

Without anything more, Johnson has failed to identify sufficient evidence from which a reasonable factfinder could infer that the selection, provision, and retention of Russell and the Russell funds was objectively imprudent.[11]

### B. Russell is also shielded from liability by the unambiguous terms of the IMA.

Although the above inquiry appears to end the matter, Russell argues there is an additional aspect of this case that would ultimately render the above analysis immaterial to Russell: Russell says that under the IMA, the decision to select and retain funds was reserved solely to Royal Caribbean. (*E.g.*, Russell's Mot. 7–8.) Because of that, Russell maintains, it was never acting as a fiduciary in either selecting or retaining the Russell funds in the

---

[10] Johnson misstates the burden of proof when she criticizes Russell for "present[ing] no affirmative argument that the Russell TDFs were actually prudent investments." (Pl.'s Resp. to Russell at 20.) That is incorrect. Instead, it is Johnson's burden to supply evidence from which a factfinder could infer that the investment was not prudent. *See Pizarro*, 111 F.4th at 1177 ("[T]o succeed on a breach-of-fiduciary-duty claim, a plaintiff must convince a factfinder that the fiduciary's choice was objectively unreasonable.")

[11] Although Johnson argues, in barebones fashion, that Royal Caribbean also overpaid Russell, contending Royal Caribbean should have negotiated lower fees, she does not ever tie this issue to loss causation; nor does she point to any record evidence that would alter that loss-causation analysis. (Pl.'s Resp. to RC at 15.) Furthermore, Johnson's complaint is devoid of any allegation or claim that her case is premised on the Russell's fees' being too high. Accordingly, she cannot raise that as a claim now, in responding to a motion for summary judgment.

Plan. (*Id.* at 7.) To the extent, then, that one might argue a full analysis of Russell's fiduciary responsibilities is not dictated by ERISA alone, but instead also hinges on the agreement, the Court addresses the relevant terms of the IMA.

Russell argues that its fiduciary obligations ran only to its responsibilities, under the IMA, for managing the assets of the funds that Royal Caribbean selected and retained for the Plan. (*E.g.*, Russell's Mot. at 11 ("[O]nce assets were invested in the funds [at Royal Caribbean's direction], Russell would manage the assets within the funds, consistent with the funds' investment objectives.").) Russell also recites various IMA provisions that it says clearly circumscribed the extent of Russell's fiduciary obligations and liabilities. In response, Johnson disagrees, positing that, under the IMA, Russell declared itself a 3(21) fiduciary to the Plan "without limitation." (Pl.'s Resp. to Russell at 5.) According to Johnson, "[t]he IMA does not limit the scope of Russell's 3(21) duties in any way." (*Id.* at 12.) After review, the Court agrees with Russell.

Johnson is correct that, under the IMA, Russell (1) "acknowledges that it is a fiduciary within the meaning of Section 3(21) of ERISA with respect to the Plan" and (2) agrees that it is engaged as an "investment manager" as to the "Investment Account," which was defined as consisting "of those assets transferred" into it as directed by the Investment Committee. (Pl.'s Resp. Stmt. to Russell ¶ 10 (citing Russell's Ex. 6, IMA §§ 1.1, 1.2, ECF No. 181-17, 4).) At the same time, however, Johnson simply ignores or disregards the several IMA provisions that circumscribe the extent of Russell's responsibilities and liabilities.

For instance, the IMA specifies that Russell was required to "invest the assets of the Investment Account in the specific funds" and "in the proportions" set forth in an "Allocation Certificate and Rebalance Authorization, delivered to [Russell] by the [Investment Committee]." (Russell's Stmt. ¶ 11 (quoting Russell's Ex. 6, IMA § 2.1(a), ECF No. 181-17, 5).) The Investment Committee, prior to the IMA's execution, had delivered an Allocation Certificate to Russell, directing Russell to invest the Investment Account's assets solely in Russell's TDFs and five Asset Class Funds: the Russell 1000 Index Fund, the Russell Small Cap Fund, the Russell All international Markets Fund, the Russell RITC Multi-Manager Bond Fund, and the Russell Investment Contract Fund. (Russell's Stmt. ¶ 15.)

The IMA also provided Russell "shall not be liable for any act or omission" of the Investment Committee in managing the Plan's assets. (Russell's Stmt. ¶ 12 (quoting Russell's Ex. 6, IMA § 2.1(d), ECF No. 181-17, 5).) Indeed, as the IMA set forth, the Investment Committee was "*solely*

responsible for assuring that the allocation and rebalancing directions as provided in the Certificate are prudent for the Investment Account assets." (Russell's Stmt. ¶ 13 (emphasis added (quoting Russell's Ex. 6, IMA § 2.2(a)(ii), ECF No. 181-17, 6); *see also* Russell's Ex. 6, IMA § 2.2(a)(iii) ("[T]he decision to allocate any assets of the Plan to the Investment Account is *solely* the responsibility of the [Investment Committee].") (emphasis added).) As the IMA spelled out, Russell had "only such duties with respect to the Plan as are specified in the [the IMA]" and had "no obligation to review or conduct further inquiry on any Certificate and may rely on a Certificate until such time as a substitute Certificate is received by [Russell] from the [Investment Committee]." (Russell's Stmt. ¶ 14 (quoting Russell's Ex. 6, IMA § 2.1(a), (d), ECF No. 181-17, 5).)

Except for a passing mention of section 2.2(a)(ii), Johnson fails to address, much less analyze, these provisions. Instead, she focuses on the IMA's reference to Russell's being "a fiduciary within the meaning of Section 3(21) of ERISA with respect to the Plan." (Pl.'s Resp. to Russell at 12.) From there, Johnson advances her theory that "3(21)" is a "term of art" in the industry and is universally understood to mean that a firm identified as a "3(21)" advisor "provides advice, but . . . lacks discretion over plan assets and the fiduciary decision-making typically lies with the fiduciary committee." (*Id.*) According to Johnson, "[t]hese accepted duties typically see the 3(21) [advisor] analyze and recommend investments to include on the plan's investment menu and monitor the Plan's investments and recommend removal of investments." (*Id.* (cleaned up).) Then, instead of acknowledging the contrary provisions cited by Russell, Johnson simply pretends they don't exist and posits, "Given the lack of any explicit limitation on Russell's 3(21) fiduciary responsibility in the IMA, the industry definition controls." (*Id.*) Johnson's attempt to simply ignore the limiting provisions is unavailing.

Further, there is nothing in the text of ERISA, as Johnson appears to imply, that would render these provisions nullities. Instead, § 3(21) of ERISA is a definitional provision that lists several scenarios where fiduciary duties arise, including when an entity (i) "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," *or* (ii) "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so," *or* (iii) "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C.A. § 1002(21)(A). The separate, disjunctive clauses show that a fiduciary under § 3(21) *can* be responsible, under ERISA, for *any* of these things; it does not

mean, as Johnson seems to read it, that every § 3(21) fiduciary is doing *all* of them. The issue here isn't whether Russell was a fiduciary, but, rather, in what capacity.

In further attempting to avoid the limiting provisions of the IMA, Johnson resorts to pointing to extrinsic evidence, mostly relating to the RFP process, to support her theory, much of which is recounted above. (Pl.'s Resp. to Russell at 13–15.) While this evidence is indeed probative of what the parties might have planned or intended for Russell's engagement, or even what various individuals involved in executing the agreement might have understood, Johnson fails to supply any authority that would warrant the Court's consideration of that evidence here. For example, she makes no argument that extrinsic evidence is required because the terms of the IMA are ambiguous. To the contrary, actually, Johnson herself refers to the "unambiguous text of the IMA." (Pl.'s Resp. to Russell at 13.) And further, any reliance on extrinsic history, leading up to the execution of the IMA, is, in any event, barred by the IMA's integration clause: "This Agreement . . . constitutes the entire agreement between the parties hereto with respect to the subject matter hereof" and "[a]ny prior agreements, promises, negotiations or representations not expressly set forth in this Agreement are of no force and effect." (IMA § 20, ECF No. 181-17, 13.) Johnson supplies no legal authority, nor is the Court aware of any, that would permit the introduction of the extrinsic evidence Johnson relies on to override the clear term of the parties' agreement. *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 410 (S.D.N.Y. 2011)[12] ("Deliberate choices by sophisticated, counseled parties dealing at arm's length . . . must be given effect," "particularly . . . when the controlling agreement contains an integration clause.") (cleaned up).

In sum then, the Court agrees with Russell. Under the straightforward terms of the IMA, Russell had no duty or discretion to select the funds in which Plan assets were invested and Royal Caribbean alone was responsible for the selection and retention of the funds. Accordingly, under the IMA, Russell was not acting as an ERISA fiduciary as a matter of law with respect to any of the decisions Johnson challenges.

---

[12] Except for laws preempted by federal law, the IMA is governed by New York law. (IMA § 16, ECF No. 181-17, 12.)

### 4. Conclusion

For the reasons set forth above, the Court **grants** both motions (**ECF No. 176, 179**), entering summary judgment on all Johnson's claims, in favor of the three Defendants.[13]

The Clerk is directed to **close** this case and **deny** any pending motions **as moot**. The Clerk is further directed to **remove** this case from the Court's trial calendar.

**Done and ordered** in Miami, Florida, on January 31, 2025.

Robert N. Scola, Jr.
United States District Judge

---

[13] Although Johnson's complaint challenges other Russell funds, Johnson does not dispute that her claims ultimately rest only on the Russell TDFs. (*See* RC's Mot. at 6 n. 1, 25 n. 16 ("Plaintiff also fails to meet her burden with respect to the non-TDF Russell Funds. While one of Plaintiff's experts purports to calculate damages related to the non-TDF Russell Funds, ***none*** of her experts opine that ***any*** of these funds were objectively imprudent.") (emphasis in original). Additionally, as Royal Caribbean points out, because Johnson has failed to make any arguments in support of her claims for equitable relief, those claims are waived. *See Pizarro,* 111 F.4th at 1182 ("[G]rounds not relied on at summary judgment are abandoned.").